Filed 8/19/24  P. v. Camphor CA1/1
Opinon after recalling remittitur
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>HENERY L. CAMPHOR, JR.,<br><br>    Defendant and Appellant. | A151488<br><br>(Alameda County<br>Super. Ct. No. 178180) |

A jury convicted defendant of three counts of lewd conduct with a child. In a nonpublished opinion filed October 5, 2018, we affirmed his conviction and modified the judgment to award defendant conduct credit for his presentence confinement.  Subsequently, defendant filed a motion to recall the remittitur based on the ineffective assistance of appellate counsel.  We granted the unopposed motion and vacated our prior opinion.  The parties filed supplemental briefs addressing several issues not raised in the prior briefing on appeal.

Defendant contends his convictions must be reversed because the trial court prejudicially erred in admitting unreliable child sexual abuse accommodation syndrome expert testimony, the prosecutor committed misconduct at several points during closing argument, defendant's sentence under the "One Strike" law must be vacated, defendant's 110-year-to-life sentence is cruel and unusual in violation of the state and federal

Constitutions, and we should remand for the trial court to consider whether to modify his sentence to strike enhancements for a prior felony conviction and prior prison term.

In our prior opinion in this appeal, we rejected these arguments except for defendant's contention the case must be remanded for the trial court to exercise its discretion under amendments to Penal Code sections 667 and 667.5 that were enacted following defendant's conviction. The Supreme Court granted defendant's petition for review and, after issuing its decision in *In re Vaquera* (2024) 15 Cal.5th 706 (*Vaquera*), returned the matter to us with directions to vacate our decision and reconsider the cause in light of *Vaquera*. After consideration of *Vaquera* and the parties' supplemental briefs, we reach the same disposition. We address *Vaquera* in part II.C. of the Discussion section of this opinion and otherwise largely reissue our prior decision.

## I. FACTUAL AND PROCEDURAL BACKGROUND

We summarize only those facts necessary to our decision. We include additional facts in the relevant portions of our discussion.

John Doe 1 and his cousin, John Doe 2, lived with other members of their extended families in a five-bedroom home in Alameda. One of the members of the household, Sergio, is the boys' uncle. Sergio met defendant at a church, and when Sergio was 13 or 14 years old, he introduced his older brother, Isaac, to defendant. After defendant befriended Sergio, he started "hanging out" with Isaac at the Alameda residence. He also came over to watch "a couple of baseball games," and attended a few family gatherings.

Over time, defendant became acquainted with other members of the family, including nine-year-old John Doe 1 and eight-year-old John Doe 2. On several occasions, defendant came to the Alameda residence for movie

nights where he, Isaac, and Does 1 and 2 ate food brought over by defendant and watched movies rented by defendant in Isaac's bedroom. In addition to movie nights, defendant took Does 1 and 2 to baseball practice, and out to the beach, McDonald's, Little Caesars, and a sports facility, the Bladium. Occasionally, defendant would take Does 1 and 2 to the old naval base in Alameda and let them drive his car by sitting on the center console or on his lap while turning the steering wheel.

Between late December 2013 and late June 2014, defendant took Isaac, Sergio, and John Does 1 and 2 on camping trips to Lake Chabot. On one or two occasions, defendant took only Does 1 and 2 on a camping trip.

Both John Doe 1 and John Doe 2 testified at defendant's jury trial. According to Doe 1, defendant drove him and his cousin, Doe 2, to Lake Chabot for a camping trip, "[e]stimating" the trip took place during spring break of 2014. When they arrived at the campsite, it was dark. Inside the tent, Doe 1 slept on top of his sleeping bag because the rocks were "hurting" and "bothering" him. After Doe 1 went to sleep, while it was still dark, he woke up because "[s]omething was rubbing [his] bottom" and penis between his "boxers" and "PJs" as he laid on his left side. Doe 1 then "got up," but as he "went to go turn on the light [defendant] was right behind [him]." And when Doe 1 turned on the light, defendant was next to where Doe 1 had been sleeping, laying down in a position "that would have been to [Doe 1's] back." Though Doe 1 felt "[u]ncomfortable" and "wanted to leave," he instead turned off the light, laid down in a different spot of the tent, and went back to sleep.

John Doe 1 woke up again when he heard John Doe 2 yelling, "Get off me." After turning on the light, he saw defendant "on top of" John Doe 2, who was on his stomach. Defendant's clothing on the bottom half of his body was "down to his knees," and Doe 1 could see his bottom. Doe 2 was "moving

3

around trying to get [defendant] off of him." Doe 1 kept telling defendant to "get off" Doe 2, and eventually defendant did so.

John Doe 2 described the molestations at trial first testifying that he and John Doe 1 rode with defendant for a camping trip at Lake Chabot. Initially, Doe 2 was in the backseat of the vehicle with Doe 1, but at defendant's instruction, "crawled over" to the front passenger seat. As Doe 2 was crawling to the passenger seat, defendant pulled Doe 2's sweatpants down to his thighs. Once he sat in the front passenger seat, defendant told Doe 2 to sit on his lap. Before Doe 2 could sit on defendant's lap, however, defendant pulled his own pants to his knees, stating he was airing them out. When Doe 2 eventually sat on defendant's lap to steer the car, defendant was still wearing boxer underwear. While Doe 2 was on defendant's lap steering the vehicle, he noticed defendant was having an "erection." Defendant began moving his "thigh part" side to side, and Doe 2 felt defendant's penis under him. Defendant also put his hand on Doe 2's penis and rubbed it. In response, Doe 2 used his hands to push defendant's head against the window and moved back to the passenger seat.

When all three arrived at the campsite, John Doe 2 ate some hot dogs and chips. After he finished eating, he changed into his pajamas, and went to sleep in defendant's tent. Later, as Doe 2 laid on his stomach asleep, he woke up because he felt defendant's penis on his bottom. Doe 2's underwear and pants "were down," and defendant was laying over him with "with his leg over" Doe 2's legs. He remembered a light going on "from outside," and defendant was now next to him, acting like he was asleep. Doe 2 pulled up his pants and went back to sleep, but awoke again, finding his hand on defendant's penis. Defendant moved Doe 2's hand back and forth. Next he

4

saw defendant laying on the ground facing the front of John Doe 1, with his hand on Doe 1's penis outside of his clothing.

The following day, defendant took both boys home. According to John Doe 1, defendant told him and John Doe 2, when he dropped them off, not to tell anyone what he had done the previous night. Several days later, John Does 1 and 2 talked to Isaac about what happened on their camping trip. Doe 1 did most of the talking, but Isaac "kind of believed [them] but he kind of at the same time he thought [they] were lying." Isaac, in turn, reported this conversation to his foster mother, who did not believe him.

John Does 1 and 2, along with Isaac and his friend, Gabe, subsequently went on another camping trip with defendant. Doe 1 felt safe because Isaac was "very brave and strong and would protect us." Neither Doe 1 nor 2 described any inappropriate touching during that trip.

On July 4th, there was a family gathering. At some point, John Doe 1's mother mentioned that a friend of hers stated a man, who the family knew from "fishing at the rock wall," was a pedophile. A family member then showed Doe 1's father, a picture on his cell phone of defendant whose face appeared on a Megan's Law or similar Web site. After Doe 1's father saw defendant's picture on the Web site, he summoned Does 1 and 2 to his mother's room and asked each if defendant had ever touched them sexually or inappropriately. Does 1 and 2 indicated defendant had touched them inappropriately.

Following his conversation with John Does 1 and 2, Doe 1's father called the Alameda Police Department. When the Alameda police arrived at the residence, Doe 1's father was told he needed to contact the East Bay Regional Parks police. Later that day, defendant came over to the house and Doe 1's father hit him several times.

5

A few days later, John Does 1 and 2 were interviewed at CALICO (Child Abuse, Listening, Interviewing, and Coordination center). Both boys said defendant had sexually molested them during a camping trip. Doe 2 exaggerated and even lied about some of the details of defendant's actions because he wanted people to take him seriously.

At trial, R.R. testified that in 2001, when he was seven years old, defendant sexually molested him. He testified that when he was seven years old, he lived in a one-bedroom apartment with his mother, brothers, and sister. Defendant did not live in the apartment complex, but knew someone who lived there, and he would "show up around the complex." Through his friends who also lived at the complex, R.R. had contact with defendant. According to R.R., defendant "would take a couple of us in his car and just drive around and put us out to sell candy and stuff." In February 2001, defendant drove R.R. to a toy store where he bought fake paper money and gave it to R.R. Following the stop at the toy store, defendant drove to a park. It was already dark outside, but the lights were on inside the car. Defendant took off R.R.'s top and bottom clothing, after which defendant took off his own pants and underwear. Next, defendant, who was on the driver's side, placed R.R. on his lap. He touched R.R.'s legs, thighs, and "privates" and moved his penis against R.R.'s "bottom, torso" in a "[w]obbly" manner. While defendant and R.R. were in the car, the police made contact with them. Defendant was convicted of molesting R.R. in 2002.

Several other witnesses also testified during the trial. Child sexual abuse accommodation syndrome (CSAAS) expert, Dr. Anthony Urquiza, testified for the prosecution, explaining the common reactions of children to sexual abuse. Dr. Bradley McAuliff, a professor of psychology, testified for

6

the defense as an expert on the suggestibility of children in cases of alleged sexual abuse.

In March 2017, the Alameda County District Attorney filed a second amended information charging defendant with three counts of lewd act upon a child, in violation of Penal Code section 288, subdivision (a). The information further alleged defendant's crimes had involved multiple victims (Pen. Code, § 667.61) and defendant had previously been convicted of lewd act upon a child (*id.*, §§ 667, subds. (a)(1) & (e)(1), 667.5, subd. (c), 667.71, subd. (b), 1170.12, subd. (c)(1), 1192.7, subd. (c)). The information further alleged defendant had served a prior prison term and had not remained free of prison custody for five years as of the time he committed the charged crimes. (Pen. Code, § 667.5, subd. (b).)

In April 2017, a jury convicted defendant as charged.

The trial court sentenced defendant to an aggregate prison term of 110 years to life with pretrial custody credits of 1,105 days.

## II. DISCUSSION

### A. CSAAS Evidence

Defendant contends the trial court erred by admitting CSAAS evidence in violation of several constitutional and statutory provisions. For the reasons explained below, we disagree.

#### 1. Additional Background

##### a. Motions in Limine

The prosecution moved in limine to admit CSAAS evidence at trial "to dispel myths and misconceptions concerning child molestation and sexual assault." Defendant responded with a motion in limine to exclude CSAAS evidence, arguing its admission was improper because it was a clinical model

7

not based on facts specific to the case, could not be narrowly tailored, and would not assist the trier of fact.

At the hearing on the motions in limine, the prosecutor argued the delayed disclosure aspect of CSAAS was relevant because while John Does 1 and 2 immediately told their 17-year-old uncle, Isaac, about the molestation after "the most egregious events," he did not believe them, and "it took them quite a while to get to the point where they told an adult subsequently." The prosecutor also argued "there was behavior by the defendant . . . [that] could be considered grooming behavior," a part of the accommodation aspect of the syndrome that could "give context" to John Does 1's and 2's reaction to the touching and escalation of the touching.

The trial court found the CSAAS evidence "relevant as a matter of law," and ruled "the contents of what they can testify to is limited also as a matter of law." The court emphasized the expert could not "ultimatedly [*sic*] give an opinion as to the fact whether or not these boys were molested," and told the parties to object if the experts "have gone beyond the scope of what they should have testified to."

### b. Expert Testimony

Dr. Anthony Urquiza, a licensed clinical psychologist employed as a professor and director of the Child Care Center with the Department of Pediatrics at the University of California, Davis Medical Center, testified for the prosecution as an expert on CSAAS. He told the jury that CSAAS is essentially "an educational tool" developed by Roland Summit in 1983. It first appeared in a professional journal article written to "inform therapists about commonalities or common characteristics or the context in which child abuse occurs." There are five parts to CSAAS as written: (1) secrecy, (2) helplessness, (3) entrapment and accommodation, (4) delayed and

8

unconvincing disclosure, and (5) recantation or retraction.  He testified not all elements are necessarily present in a given case; rather Summit "wrote about . . . characteristics that are common to a child who has been sexually abused for the purpose of educating" child therapists and the five parts were "different ways in which children will respond to being sexual victims."  He emphasized the CSAAS is not a diagnostic tool and cannot be used to prove or disprove that any specific child has been sexually abused.  He also testified he would not "have an opinion as to whether a particular person was abused or not, or whether a particular person was guilty or innocent of the crime."

Dr. Urquiza also testified CSAAS applies in a situation where the abuse victim knows their assailant.  When asked by the prosecution if he could estimate how often child abuse victims know their abusers, Dr. Urquiza testified, "[F]or me to say a specific number is a little bit tricky, because there are lots of different studies and they all have somewhat different numbers.  But I think it's fair to say that by far most children are sexually abused by somebody that they know or somebody with whom they have some type of ongoing relationship.  I would say in the percentages probably in around 90 percent or so where there is some type of relationship or awareness between the child and the perpetrator."

The trial court instructed the jury that "Dr. Urquiza's testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged against him. [¶] You may consider this evidence only in deciding whether or not [John Doe 1's and 2's] conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of their testimony."

*2. Analysis*

Expert opinion testimony is admissible when the subject matter is
"beyond common experience," and the expert's opinion would assist the jury.
(Evid. Code, § 801, subd. (a).)  An expert opinion may be provided at trial
even if the jurors have some knowledge of the topic, as long as the expert
testimony would assist the jury.  (*People v. Prince* (2007) 40 Cal.4th 1179,
1222 [an expert may testify on a subject about which jurors are not " 'wholly
ignorant' "].)

We review the trial court's decision to admit expert testimony for abuse
of discretion.  (*People v. McDowell* (2012) 54 Cal.4th 395, 426.)

### a. *Kelly/Frye* and Reliability

Defendant first contends the trial court erred in admitting the CSAAS
evidence because it does not satisfy the *Kelly/Frye*[1] framework for the
admission of scientific evidence.  Though defendant acknowledges California
courts have repeatedly held CSAAS evidence is admissible without any
*Kelly/Frye* showing when offered to rebut misconceptions about child abuse,
he argues the time has nonetheless come to reevaluate these precedents.  He
further argues the trial court erred in failing to consider the reliability of Dr.
Urquiza's testimony under Evidence Code sections 801, 802, and *Sargon
Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747,
770 (*Sargon*).

More than 30 years ago, our Supreme Court recognized in *People v.
McAlpin* (1991) 53 Cal.3d 1289 (*McAlpin*), that California courts have found
expert testimony on the common reactions of child molestation victims
(CSAAS evidence) admissible, noting such testimony is " 'needed to disabuse

---

[1] *People v. Kelly* (1976) 17 Cal.3d 24, 30 (*Kelly*); *Frye v. U.S.* (D.C. Cir.
1923) 293 F. 1013, 1014 (*Frye*).

jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior.' " (*Id.* at pp. 1300–1301.) The court explained CSAAS evidence is admissible not to prove the complaining witness had been abused, but to rehabilitate the witness's credibility. (*Ibid.*) In 2004, the Supreme Court cited *McAlpin* with approval to extend its principles to expert testimony on the common behaviors of victims of domestic violence. (See *People v. Brown* (2004) 33 Cal.4th 892, 906.) Courts of Appeal have consistently followed *McAlpin* and *Brown* in holding CSAAS testimony is admissible to rehabilitate witness credibility and explain the behavior and treatment of children who are sexually abused. (See, e.g., *People v. Munch* (2020) 52 Cal.App.5th 464, 468; *People v. Julian* (2019) 34 Cal.App.5th 878, 885; *People v. Perez* (2010) 182 Cal.App.4th 231, 245.)

Defendant relies on an academic article and two judicial decisions from New Jersey and Kentucky that reject or question the use of CSAAS evidence in criminal trials to argue we should reconsider existing precedent. These authorities, however, do not prevail over the authority of our own Supreme Court.[2] (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 456.)

Defendant also argues the trial court should have conducted a "*Sargon Enterprises* inquiry into the basis of CSAAS evidence," and had the court

___

[2] We likewise reject defendant's argument that CSAAS evidence is inadmissible because the sexual molestation of children no longer falls outside the common experience of jurors. Defendant cites an article stating an estimated 30 percent of male children and 40 percent of female children are molested in some way and notes the season premiere of a popular television series, *Law and Order: Special Victims Unit*, dealt with the subject of childhood sexual abuse. We cannot assume, as defendant apparently suggests, that these facts show the average juror is familiar with the behavior of child victims of sex crimes, or that expert testimony on the subject would be unhelpful to the jury.

done so, it would have rejected the evidence, much like the New Jersey Supreme Court. As our Supreme Court explained in *Sargon*, however, "under Evidence Code sections 801, subdivision (b), and 802, the trial court acts as a gatekeeper to exclude expert opinion testimony that is (1) based on a matter of a type on which an expert may not reasonably rely, (2) based on reasons unsupported by the material on which the expert relies, or (3) speculative." (*Sargon*, *supra*, 55 Cal.4th at pp. 771–772.) In doing so, the "court must not weigh an opinion's probative value or substitute its own opinion for the expert's opinion. Rather, the court must simply determine whether the matter relied on can provide a reasonable basis for the opinion or whether that opinion is based on a leap of logic or conjecture. . . . The goal of trial court gatekeeping is simply to exclude 'clearly invalid and unreliable' expert opinion." (*Id.* at p. 772.) Dr. Urquiza's expert testimony was based on (1) Dr. Summit's article, which in turn was based on Summit's clinical experience and interviews with other experts; (2) other research; and (3) Urquiza's own clinical and teaching experience over the course of his 26-year career, including his treatment of "in excess of a thousand children." Defendant has not shown his testimony was clearly invalid or unreliable.

We also reject defendant's claim that the CSAAS evidence was inadmissible under the *Kelly*/*Frye* framework. In *Kelly,* the California Supreme Court adopted the test set out in *Frye*, *supra,* 293 F. at page 1014, which requires a party proffering expert testimony based on a new scientific technique to establish the technique's reliability and acceptance within the relevant scientific community before the testimony will be allowed. (*Kelly*, *supra,* 17 Cal.3d at p. 30.) By its terms, the *Kelly*/*Frye* rule only applies to new scientific techniques.

As defendant recognizes, court's decisions about whether *Kelly*/*Frye* applies to CSAAS testimony have typically depended on whether the testimony is offered as direct evidence of a defendant's guilt, or for another purpose, such as to rehabilitate a victim's credibility or explain a victim's reactions to the abuse. When offered for the former purpose, as a predictive tool, courts have applied *Kelly*/*Frye* and excluded the testimony. (See, e.g., *People v. Bowker* (1988) 203 Cal.App.3d 385, 389–395 (*Bowker*).) When offered for the latter purpose, however, the *Kelly*/*Frye* reliability standard does not apply because the testimony does not concern a new scientific method of proving that molestation had occurred.[3] (See, e.g., *People v. Wells* (2004) 118 Cal.App.4th 179, 187–190; *People v. Gray* (1986) 187 Cal.App.3d 213, 218–219.)

Here, Dr. Urquiza specifically stated in his testimony that CSAAS was not a diagnostic tool, and he did not opine as to whether the boys had, in fact, been molested. Moreover, the trial court instructed the jury not to use his testimony as evidence of guilt. (See, e.g. *People v. Housley* (1992) 6 Cal.App.4th 947, 958–959 [limiting instruction that CSAAS evidence should not be used to determine whether molestation happened would clearly define proper use of testimony and prevent jury from using expert testimony as proof of molestation].) Because the CSAAS testimony was not offered to prove the charged crimes but to give context to John Does 1's and 2's conduct, *Kelly*/*Frye* does not apply, and we reject defendant's argument the evidence was inadmissible.

---

[3] We address in part II.A.2.c. and d., *post*, defendant's claims that the prosecution relied on specific portions of Dr. Urquiza's testimony to prove that the molestation occurred.

### b. Not Tailored

Defendant next cites *Bowker, supra,* 203 Cal.App.3d at pages 393–394, to support his argument that "the prosecutor must identify 'the "myth" or ["]misconception" to be rebutted and the evidence must be tailored to address only that aspect.' " Defendant contends because the prosecution failed to do so here, the CSAAS testimony was inadmissible. We reject the argument.

First, at the hearing on the motion in limine, the prosecutor discussed the relevance of Dr. Urquiza's testimony. Specifically, she argued the delayed disclosure element was present because "the two boys did have a conversation with their 17-year-old uncle soon after the most egregious events in this case. However, they were dismissed out of hand and it took them quite a while to get to the point where they told an adult subsequently." She also argued defendant exhibited grooming behavior, which is part of the accommodation element of CSAAS. She believed Dr. Urquiza's testimony "would explain and give context to . . . the two John Does['] behavior in this case as far as their reactions to any touching, any escalation of touching . . . ."

Defendant challenges the prosecution's explanation regarding delayed disclosure because it does not track the content of Dr. Summit's work on CSAAS and Dr. Urquiza failed to "provide examples from the literature or from his clinical practice supporting his testimony that disclosure followed by disbelief equals delayed disclosure consistent with CSAAS." Dr. Urquiza testified, however, that the five components of CSAAS reoccurred frequently in cases he has personally seen. With regard to delayed disclosure he testified in part that "if a child is able to ultimately be able to sort of cross that barrier and say this is what happened to me, and there is not a supportive positive response, then it's hard to sustain that disclosure. [¶] More practically, why keep putting this sense of embarrassment or shame

14

out to people if no one is going to do anything about it.  And so failing to get a positive response to a disclosure is a really difficult thing, often makes kids not to want say [*sic*] more about the abuse."  Whether he offered examples from his own practice or the literature goes to the weight and not the admissibility of his testimony.

Second, while the *Bowker* opinion states that a prosecutor must identify the myth or misconception to be rebutted by CSAAS evidence, courts have not interpreted that "as requiring the prosecution to expressly state on the record the evidence which is inconsistent with the finding of molestation." (*People v. Patino* (1994) 26 Cal.App.4th 1737, 1744.)  As the *Patino* court explained, "[i]t is sufficient if the victim's credibility is placed in issue due to . . . paradoxical behavior" and CSAAS evidence is "pertinent and admissible if an issue has been raised as to the victim's credibility."  (*Id.* at pp. 1744–1745.)  Here, the boys' credibility was a central issue at trial and CSAAS testimony was admissible to help the jury understand their actions in response to the abuse.

Finally, even if the prosecution improperly failed to identify the myth or misconception it was seeking to rebut, we conclude any error was harmless for the reasons discussed further below.

### c. Statistics

Defendant next complains that Dr. Urquiza improperly testified that "it's fair to say that by far most children are sexually abused by somebody that they know or somebody with whom they have some type of ongoing relationship.  I would say in the percentages probably in around 90 percent or so."  Relying on *People v. Wilson* (2019) 33 Cal.App.5th 559, 571 (*Wilson*) and *People v. Julian* (2019) 34 Cal.App.5th 878, 885–886 (*Julian*), defendant contends the testimony " 'invited jurors to presume [defendant] was guilty

15

based on statistical probabilities,' " and deprived defendant of his right to a fair trial.

Defendant's reliance on *Wilson* and *Julian* is misplaced. In both cases, Dr. Urquiza testified for the prosecution about the five components of CSAAS, and in both cases was asked if children ever falsely accuse an adult of sexual molestation. In *Wilson*, he testified that false allegations occur " 'very infrequently or rarely' " and that "between 94 and 99 percent" of children who reported sexual abuse were telling the truth. (*Wilson, supra*, 33 Cal.App.5th at p. 568.) In *Julian*, he provided testimony that false allegations of sexual abuse do not happen very often and provided statistics as to the percentage of cases (between 1 and 8 percent) in which a child had lied. (*Julian, supra*, 34 Cal.App.5th at pp. 885–886.)

Here, however, Dr. Urquiza did not testify about the percentage of false allegations as he did in *Wilson* and *Julian*. He testified that although it was "a little bit tricky" to give a specific number, he estimated "probably" "around 90 percent" of abused children *know their abuser*. That testimony did not endorse the testimony of John Does 1 and 2, nor did the fact that the boys knew defendant, standing alone, suggest he was guilty of molesting them. Instead, the testimony disabused jurors of a common stereotype—that a child molester is "an old man in shabby clothes who loiters in playgrounds or schoolyards and lures unsuspecting children into sexual contact by offering them candy or money." (See *McAlpin, supra,* 53 Cal.3d at p. 1302.) The trial court did not abuse its discretion in allowing this testimony.

### d. "Profile Evidence"

Dr. Urquiza also testified "grooming . . . is one of the strategies often that are used by perpetrators to gain access to a child to sexually abuse them," and is "a process by which the relationship is developed, it's a trusting

16

relationship, and there's an increasing amount of . . . sexual behavior . . . ." Defendant notes Dr. Summit's CSAAS article did not discuss grooming,[4] and because Urquiza's testimony focused on the perpetrator, not the children's reactions to abuse, it amounted to inadmissible profile evidence that should not have been allowed under the "banner of CSAAS." When asked whether it is unusual for someone to molest two victims at once in the same place, Dr. Urquiza testified that while it is "not as common," it "does happen." Defendant contends this evidence about how perpetrators act was outside the scope of Dr. Urquiza's expertise, and the trial court erred in overruling defense counsel's objection.

"A profile ordinarily constitutes a set of circumstances—some innocuous—characteristic of certain crimes or criminals, said to comprise a typical pattern of behavior. In profile testimony, the expert compares the behavior of the defendant to the pattern or profile and concludes the defendant fits the profile." (*People v. Prince*, *supra*, 40 Cal.4th at p. 1226; *People v. Lopez* (1994) 21 Cal.App.4th 1551, 1555 [" 'Profile evidence is a "point by point examination of profile characteristics" that enable[s] an investigator to justify pursuing the matter.' "].) Dr. Urquiza made no such in depth examination here but testified briefly and generally that grooming is a strategy "often" used by abusers to gain access to children and establish trust and that sometimes, abusers abuse more than one child at a time in the same place. As in *Prince,* his "testimony did not refer to defendant at all" and "did

---

[4] We reject defendant's argument that the subject of grooming falls outside the scope of CSAAS. While Dr. Urquiza testified the initial 1983 article on CSAAS by Dr. Summit did not use the term "grooming," it discussed "systematic desensitization" in the context of secrecy as "how the relationship was developed, and that is used to manipulate and coerce a child." Dr. Urquiza explained that "systematic desensitization" is the "fancy psychological name for grooming."

not evaluate *defendant's* behavior against a pattern or profile." (*Prince*, at p. 1226.) This type of background evidence does not specifically address the guilt or innocence of defendant but helps the jury understand other evidence and was not improper.

### e. Evidence Code Section 352

Defendant next argues that the trial court failed to weigh the probative value of Dr. Urquiza's testimony against its prejudicial effect, even though defense counsel included an objection under Evidence Code section 352 in her moving papers.

Relevant evidence may be excluded under Evidence Code section 352 where "its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." Our Supreme Court has explained that " ' "The 'prejudice' referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues." ' " (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1035.)

Defendant cites nothing in the record to suggest the trial court failed to conduct the weighing required by Evidence Code section 352 other than the fact that the court made no express statement that it had done so. But, as defendant readily acknowledges, the weighing can be inferred from the record despite the absence of an express statement by the trial court. (See *People v. Prince, supra*, 40 Cal.4th at p. 1237.) Here, the trial court held a hearing on the parties' motions in limine, heard argument from the parties, and assured the defense attorney he would sustain any objection to Dr. Urquiza's testimony that exceeded the proper scope of its admissibility. Further, we

18

fail to see how his testimony could have created an emotional bias against defendant when Dr. Urquiza did not mention defendant and repeatedly emphasized that the CSAAS framework was intended as an educational tool to understand victim behavior and could not be used to determine whether any given individual in fact abused a child.

### f. Harmless Error

Finally, although we conclude the trial court did not err in admitting Dr. Urquiza's testimony, we also find that any possible error was harmless under *People v. Watson* (1956) 46 Cal.2d 818, 836. (See, e.g., *Wilson, supra*, 33 Cal.App.5th at pp. 571–572 [applying *Watson* standard to evaluate whether admission of statistical evidence was prejudicial]; *Bowker, supra*, 203 Cal.App.3d at p. 395 [same].) We consider whether it is reasonably probable that defendant would have achieved a more favorable result in the absence of the error. (*Watson*, at p. 836.)

Defendant argues John Doe 2 lied in his CALICO interview,[5] the defense presented evidence showing the boys might have internalized negative attitudes toward defendant based on their Uncle Isaac's negative opinion of him, and points out that the camping trip with defendant may not have occurred during their spring break in April, but in January. Dr. Urquiza, however, did not testify about any of these facts, nor did he

_____

[5] Specifically, defendant notes John Doe 2 said (1) defendant had masturbated in the car on the way to Lake Chabot, (2) defendant's head cracked the car window when John Doe 2 pushed it, and (3) defendant masturbated in the tent. John Doe 2 admitted at trial that he told the CALICO interviewer some things that were not true, including that defendant had masturbated in the car because "[his] uncle wouldn't believe [him]" and "[n]o one would believe [him]." He also affirmed that he may have exaggerated when he said defendant's car window cracked. John Doe 2 testified that it was true defendant had masturbated in the tent.

19

comment on the boys' credibility or the credibility of abused children in general.[6] The defense also had its own expert, Dr. McAuliff, opine on the suggestibility and memory of children in cases of alleged sexual abuse. Defense counsel argued the inconsistencies in the boys' testimony, their uncle's bias toward defendant, and the issue with timing of the camping trip to the jury thoroughly in closing argument, but the jury believed the boys nonetheless.

Furthermore, the evidence of guilt in this case was strong. John Doe 1 and John Doe 2 told Isaac defendant molested them on a camping trip before they had been questioned by any adult. They later repeated the allegations that defendant had molested them on a camping trip to the CALICO interviewer, and defendant's own expert testified there was no misleading or unduly suggestive questioning by the CALICO interviewer. Though John Doe 2 admitted he lied about some things in his CALICO interview, he testified he did so because Isaac had not believed him initially and he wanted to be believed. Defendant had been convicted of molesting R.R. previously, in circumstances like the crime here. He befriended R.R., took him on outings, and molested him in his car. Similarly, defendant met Sergio through church, made friends with Isaac, then expanded the circle of friendship to include the boys. He took them on outings, bought them food, and took them out to "drive" his car, eventually taking both boys on a camping trip alone where he molested them in his car and tent.

_____

[6] When questioned by defense counsel, Dr. Urquiza *did* acknowledge that false claims of sexual abuse are made by children. But he testified that it is not a subject he has researched or written about, he does not forensically evaluate whether children have been sexually abused or not, and as an expert witness it is not his place to assert whether a particular child has been abused or not.

Defendant also complains the prosecution referenced Dr. Urquiza's testimony multiple times during closing argument, "reminding the jurors how the boys' actions meshed with CSAAS." Given that CSAAS testimony is admissible to explain the behavior of victims of child abuse, we do not see how defendant was prejudiced by the prosecution's use of that testimony to explain the boys' reactions to the abuse. Moreover, as noted previously, the court expressly instructed the jury it could not use Dr. Urquiza's testimony as evidence that defendant had committed the charged crimes. Further, defense counsel herself relied on Dr. Urquiza's testimony to argue that false allegations do happen.

Defendant also contends he was prejudiced because the jury (1) asked for a readback of the boys' testimony, (2) had difficulty reaching agreement on one of the three counts against defendant, and (3) asked the court for clarification of the standard for reasonable doubt. But the jurors reached their guilty verdicts on counts one and two within just a few hours of deliberating, and their only questions focused on count three involving John Doe 2. The extra time they took to unanimously find defendant guilty of all three charges is consistent with a careful and thorough evaluation of the evidence. (See, e.g., *People v. Houston* (2005) 130 Cal.App.4th 279, 301.)

Further, defendant has not shown that allowing Dr. Urquiza's testimony could have resulted in a miscarriage of justice. As discussed previously, Dr. Urquiza generally discussed the elements of CSAAS and described common reactions of child abuse victims, stated he knew nothing about the facts of this case, and declined to express any opinion either about the credibility of the children or whether they had been sexually abused. On

21

this record, it is not reasonably probable defendant would have achieved a more favorable result in the absence of Dr. Urquiza's testimony.

## B. Prosecutorial Misconduct

Defendant argues the prosecutor committed misconduct several times during oral argument by (1) using Dr. Urquiza's testimony about CSAAS as substantive evidence of guilt, (2) denigrating the defense, (3) vouching, and (4) mischaracterizing the testimony of a defense expert.

A prosecutor who uses deceptive or reprehensible methods to persuade the jury commits misconduct. Reversal under the federal Constitution is necessary only when these methods infect the trial with such unfairness as to make the resulting conviction a denial of due process. (*People v. Salcido* (2008) 44 Cal.4th 93, 152.) A prosecutor's conduct not rising to the level of a constitutional violation is misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury. (*People v. Ledesma* (2006) 39 Cal.4th 641, 726.) "A prosecutor is given wide latitude to vigorously argue his or her case and to make fair comment upon the evidence, including reasonable inferences or deductions that may be drawn from the evidence." (*Ibid.*)

### 1. CSAAS Testimony

As to CSAAS testimony, defendant contends the prosecution twice argued to the jury that defendant was grooming not only John Does 1 and 2, but their entire family. She first said: "You heard Dr. Urquiza talk about grooming. The boys were not the only ones being groomed here. The entire family was being groomed here. Sergio was being groomed . . . . [T]he defendant was insinuating and ingratiating himself into this whole family." The trial court overruled defense counsel's objection to that argument and admonished the jury that counsel's statement are not evidence and the jury

should follow the court's instructions. Later, the prosecutor returned to the subject stating defendant paid John Doe 1's father's phone bill and "dangled jobs in front of [him]," and made "monetary investments in this family to ingratiate himself . . . ." The trial court again overruled a defense objection. Defendant argues this was misconduct for two reasons: (1) because grooming is not a part of CSAAS, and (2) because the CSAAS testimony was admitted for the limited purpose of evaluating John Doe 1's and 2's testimony, but the prosecutor used it as substantive evidence of guilt.

We agree generally with defendant that the argument was improper. As to the first comment, Dr. Urquiza testified very briefly about grooming as part of the secrecy aspect of CSAAS, but he testified only about a child abuser using grooming to gain a child's trust, not to ingratiate himself with other family members. Moreover, the prosecution argued the evidence of defendant's attempt to get close to the family not to explain the boys' conduct, but to argue defendant had a "plan" all along to molest them.

We conclude, however, that any error was nonprejudicial. While he did not call it grooming, Dr. Urquiza *did* discuss the concept that if an abuser is accepted as a trusted person in a family, it can put children "in a position of great vulnerability or helplessness." The prosecutor's remarks about grooming the family during closing argument were brief, and the trial court admonished the jury that they were not evidence and reminded them to follow the court's instructions. The jury was instructed that they could not consider the CSAAS evidence to prove defendant was guilty of committing the crime. Further, as discussed previously, the evidence of defendant's guilt was strong. In light of all these considerations, we conclude defendant was

23

not prejudiced.[7]  (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1344 [improper argument was not prejudicial where it was brief part of closing argument and evidence of guilt was strong].)

## 2. *Denigrating Defense Counsel*

Defendant next argues the prosecutor improperly denigrated defense counsel during closing argument with the following comment:  "The defense [attorney] will tell you all the reasons that the two children in this case . . . should not be believed.  There's a lot of reasons, she'll have a lot to talk about, there's a lot of inconsistencies.  As I warned you at the beginning of this case, these are child witnesses, ladies and gentlemen.  *And the defense is betting on that.  That's what happens in these cases.*"  (Italics added.)

Defendant argues the comments were improper because they suggested defense attorneys have a "stock" and "worthless" response to accusations of sexual abuse by children, and because they related to the prosecutor's experience in other cases and thus referred to matters outside the record.

We disagree that the prosecutor's comments were improper.  Rather, the comment acknowledged that the children's testimony contained certain inconsistencies and attempted to anticipate and prepare the jury for defense arguments about the credibility of John Does 1 and 2.  At most, it criticized defense tactics, not defense counsel.  Courts have frequently found similar argument appropriate.  (See, e.g., *People v. Cunningham* (2001) 25 Cal.4th 926, 1002–1003 [prosecutor's argument that defense counsel's job is " 'to create straw men,' " " 'to put up smoke, red herrings,' " and the prosecution's

_____

[7] In his reply brief, defendant argues the prosecutor's argument "went beyond arguing about a molester getting close to a family to get access to a child, for it relied on evidence not admitted substantively."  Because defendant did not raise this argument in his opening brief, did not elaborate, and did not provide citations to the record, we will not address it.

job is " 'to straighten that out and show [the jury] where the truth lies' " was not improper]; *People v. Stitely* (2005) 35 Cal.4th 514, 559 [jurors should "avoid 'fall[ing]' for [defense] counsel's argument" and should view it as a " 'ridiculous' attempt to allow defendant to 'walk' free" and a " 'legal smoke screen' "].)

### 3. *Vouching*

Defendant also argues the prosecutor improperly vouched for R.R. and John Doe 2 and relied on her professional opinion and facts outside the record when she summarized R.R.'s and John Doe 2's descriptions of what happened in defendant's car then told the jurors, "These, ladies and gentlemen, are things that people cannot make up." Defendant acknowledges that a prosecutor may argue a witness is credible based on facts in the record and inferences reasonably drawn from them but argues here the prosecutor asked the jury to rely on her personal assessment of the evidence.

Viewing the comments in context, however, the prosecutor was not vouching. In describing R.R.'s testimony about his molestation by defendant, and comparing it to the molestation of John Doe 2, the prosecutor said:

"In July of 2001, [defendant] parked near Diamond Park, the [police evidence] technician told you that location where the technician found [R.R.'s] underwear on the floor [of the car]. He told you that car was parked in Diamond Park here in Oakland. It was dark. The defendant took all of [R.R.'s] clothes off, the defendant took his own pants off. As he's sitting in the driver's seat the defendant moved [R.R.] over to his lap and put [R.R.] on his lap and moved around, engaged in masturbatory behavior with [R.R.] on his lap.

"OPD[8] caught him.  If OPD had not come up on that car we would not have this evidence, more than likely.  But we do have this evidence.  This evidence is undeniable, it is a fact to you.  And I think one of the absolute crystal clear things you can take from this evidence is the position that defendant put [R.R.] in in his car.  The position that he put [John Doe 2] in in his car.

*"These, ladies and gentlemen, are things that people cannot make up.* *These are things that exhibit the defendant's predilection, and exhibit his* *methods and exhibit the ways he victimizes boys."*  (Italics added.)

Evaluating these comments in context, the prosecutor described the molestation of R.R. in defendant's car and told the jury the police discovered defendant with R.R. and recovered R.R.'s underwear from the floor, arguing that "OPD caught him" and that evidence was "undeniable."  She then suggested defendant put John Doe 2 in a similar "position" as R.R., and made the comment that "[t]hese . . . are things that people cannot make up."  The prosecutor was discussing the evidence of defendant's prior sexual offense, which was confirmed by an Oakland police officer, drawing similarities to John Doe 2's testimony, and asking the jury to use that information to evaluate defendant's methods and predilection.  This was not improper. (*People v. Seumanu, supra,* 61 Cal.4th at p. 1330 [" ' "[S]o long as a prosecutor's assurances regarding the apparent honesty or reliability of prosecution witnesses are based on the 'facts of [the] record and the inferences reasonably drawn therefrom, rather than any purported personal knowledge or belief,' her comments cannot be characterized as improper vouching." ' "].)

---

8 Oakland Police Department.

### *4. Mischaracterizing Defense Expert's Testimony*

Dr. Bradley McAuliff testified as an expert for the defense on the suggestibility and memory of children in cases of alleged sexual abuse. McAuliff testified that a witness is "suggestible" when his or her memory or report has been compromised by an external source—based on direct questions from an interviewer, conversations a child overhears, or other "experiments that . . . seep into their report about the event." He also testified to factors that influence a witness's memory and the accuracy of the memory, including the passage of time, repeatedly asking direct or leading questions about what might have happened, "stereotype induction," and "cross contamination" through conversations with other people.

In her closing argument, the prosecutor characterized Dr. McAuliff's testimony as follows:

"I'm going to talk about Dr. McAuliff here for a minute and analyze what he says. Because essentially what he says . . . is that when a child witness comes to testify and has gone through the court process they're unreliable witnesses. That's the conclusion that he and defense counsel want you to draw, because they talk to authority figures, because they have been repeatedly questioned.

"Ladies and gentlemen, that is the criminal process. This is not a laboratory where people lie to children and then see if the children repeat the lie after interview after interview after interview. This is a court of law. *If you are to believe Dr. McAuliff's conclusion, then in no case in a court of law could you believe a child. That's the conclusion that he wants you to get.*" (Italics added.)

Defense counsel objected that the argument misstated the testimony. The court overruled the objection, but stated: "The jury will decide the

27

testimony.  They know what the evidence is, and they're shaking their heads. They know what the evidence is.  So move on."

Defendant argues mischaracterizing testimony is misconduct, and the comment on Dr. McAuliff's testimony was an improper attack on the defense strategy of questioning the boys' credibility with expert testimony about possible contamination.

"Although prosecutors have wide latitude to draw inferences from the evidence presented at trial, mischaracterizing evidence is misconduct." (*People v. Hill* (1998) 17 Cal.4th 800, 823.)  Once again taking into account the context of the prosecutor's argument, we find no error.  The prosecutor told the jury she wanted to "analyze" Dr. McAuliff's testimony, referred to his testimony that children may be unreliable witnesses when repeatedly questioned by authority figures, and told the jury if they were to believe that "conclusion" always applied, no child witness could ever be believed.  She then continued to discuss weaknesses in his testimony, including his statement that his studies were based on academic experiments rather than "real life" incidents.  The argument reasonably falls within the wide latitude granted prosecutors in argument.  Moreover, any arguable error in overstating Dr. McAuliff's "conclusion" was remedied by the trial court's immediate statements noting that "[t]he jury will decide the testimony" and the jury "know[s] what the evidence is," and the trial court's instruction to the jury that nothing the attorneys say, including their remarks during closing argument, is evidence.

### 5.  *Right to Fair Trial*

Finally, defendant contends that all of the prosecutorial errors compromised defendant's constitutional right to a fair trial and require reversal.  As discussed above, we conclude three of the four alleged errors

were not improper.  The inappropriate remarks regarding grooming the family were nonprejudicial because the evidence of molestation was strong, the remarks were brief, and they were followed by an instruction that the attorneys' remarks are not evidence and jury instructions that the jury could not use the CSAAS evidence to conclude defendant committed the crimes. Defendant's right to a fair trial was not violated.

## C.  One Strike Sentence

Defendant next argues we must remand for resentencing because the trial court failed to indicate whether his sentence was based on the habitual sexual offender (Pen. Code,[9] § 667.71) provisions or the One Strike (§ 667.61) sentence scheme and because his One Strike sentence was based on a circumstance not pleaded in the information.  Our Supreme Court directed us to reconsider this issue in light of its recent opinion in *Vaquera*.  With the benefit of the parties' supplemental briefs and after close study of the facts of this case, we conclude defendant is not entitled to resentencing under the One Strike law.

### 1.  Additional Background

The second amended information alleged three counts of lewd conduct with a child under 14, in violation of section 288, subdivision (a).  It further alleged that defendant had previously been convicted of a violation of section 288, subdivision (a) and as to each count that the prior lewd conduct conviction brought defendant within the sentencing provisions of the habitual sexual offender law (§ 667.71, subd. (b)).  The information also contained the following One Strike allegation as to each of the three counts:  "It is further alleged that the said defendant has been convicted in these proceedings of committing an offense specified in subdivision (c) of Penal Code § 667.61

---

[9] All further undesignated statutory references are to the Penal Code.

against more than one victim. It is further alleged that said defendant is punishable under the provisions of subdivisions (a) and (b) of section 667.61 and is ineligible for probation pursuant to subdivision (h) section 667.61."

In a bifurcated trial held on April 3, 2017, the trial court found true that defendant had suffered the prior lewd conduct conviction and served a prior prison term, subject to the jury's verdict. The next day, the jury convicted defendant on all three charged counts and found true that defendant had suffered the prior conviction and committed his offenses against more than one victim.

At sentencing, the trial court said it was "sentencing the defendant under two schemes." First, under the habitual sexual offender law, section 667.71, the court sentenced defendant to terms of 55 years to life on each count, based on a 25-year-to-life term under section 667.71, subdivision (b), doubled because of the prior strike, and increased by five years for the prior serious felony conviction. The court ordered counts one and three to run consecutively, but the term on count two to run concurrently because that count had been committed on the "same victim and pretty much in the same occasion" as count three. It imposed, then stayed, the one-year term under section 667.5, subdivision (b) for the prior prison term, resulting in an aggregate term of 110 years to life.

The court then sentenced defendant under the One Strike law, section 667.61, subdivision (j)(2) (section 667.61(j)(2)) to 25 years to life on all counts, doubled as a result of the prior strike, and increased by five years for the prior serious felony. The trial court again ran the sentences on counts one and three consecutively, but the sentence on count two concurrently. The court did not say it was staying the sentence under either the habitual sexual

30

offender or the One Strike sentencing schemes, but the minutes show the One Strike sentence was stayed.

### 2. *Unpleaded Allegations*

Defendant contends the trial court erred in calculating his sentence because the second amended information failed to give him adequate notice he was subject to the increased 25-year-to-life terms under the provisions of the One Strike law.[10] We disagree.

The One Strike Law is an alternative sentencing scheme that sets forth harsher indeterminate sentences when the prosecution pleads and proves specific aggravating circumstances for certain sex crimes. (*Vaquera, supra,* 15 Cal.5th at p. 713.) When the jury finds true a One Strike allegation, the offense generally will be punishable by an indeterminate sentence of 15 years to life or 25 years to life. (See § 667.61, subds. (a)–(e); *Vaquera,* at p. 713.) Under subdivision (a), the sentence is generally 25 years to life if the crime was committed under one or more of the circumstances specified in subdivision (d) or under two or more of the circumstances specified in subdivision (e) of the One Strike law. (§ 667.61, subd. (a).) Under subdivision (b), the sentence is generally 15 years to life if the crime was committed under one of the circumstances specified in subdivision (e). (§ 667.61, subd. (b).) As relevant here, the subdivision (e)(4) circumstance supports an increased sentence if the defendant committed the offense against more than one victim. (§ 667.61, subd. (e)(4).)

---

[10] Although defendant did not object to the sentencing error, we exercise our discretion to consider his claim on the merits to avoid an ineffective assistance of counsel claim and because defendant argues the trial court's error impacts his substantial rights. (See, e.g., *People v. Anderson* (2020) 9 Cal.5th 946, 961–963.)

The scheme also contains exceptions providing harsher sentences when the prosecution has pled and proved a One Strike circumstance involving a minor victim. (*Vaquera*, *supra*, 15 Cal.5th at p. 713; see § 667.61, subd. (a) ["Except as provided in subdivision (j), (*l*), or (m)"]; *id.*, subd. (b) ["Except as provided in subdivision (a), (j), (*l*), or (m)"].) Section 667.61(j)(2) provides for a sentence of 25 years to life if a defendant's offense was committed under one of the circumstances in subdivision (e) on a victim under 14 years of age. (§ 667.61, subd. (j)(2).)

In *Vaquera*, a jury convicted the defendant of two counts of lewd act on a child under age 14 in violation of section 288, subdivision (a). (*Vaquera*, 15 Cal.5th at pp. 714–715.) As to one of the counts, defendant was sentenced to an indeterminate term of 25 years to life under section 667.61(j)(2). (*Vaquera*, at pp. 715, 720–721.) Our Supreme Court held the 25-year-to-life sentence violated due process because the One Strike allegation cited only to the multiple victim circumstance in subdivision (e)(4) and subdivision (b), which provides for a sentence of 15 years to life. (*Vaquera*, at pp. 721, 723–725.) The allegation failed to provide fair notice of the prosecution's intent to invoke the circumstance on which the trial court sentenced him because it "did not specify that the prosecution was seeking 25 years to life on that count, cite to [section 667.61](j)(2), or otherwise make clear that the prosecution was seeking a longer sentence based on the victim's age." (*Vaquera,* at p. 725.)

Having determined the 25-year-to-life sentence violated the defendant's due process right to fair notice, the *Vaquera* court further concluded the error was not harmless. (*Vaquera*, *supra*, 15 Cal.5th at p. 726.) As the court explained, the purpose of statutory pleading requirements is to give a defendant the opportunity to consider the potential sentence in time to make

32

informed decisions about defense strategy.  (*Ibid.*)  "Because the information could be reasonably read as indicating that the prosecution had elected *not* to seek 25 years to life under [section 667.61](j)(2)," the Attorney General had not met its burden "to demonstrate that Vaquera was aware of the sentence the prosecution was seeking at a time when he could have taken his sentencing exposure into consideration in making key decisions about how to conduct his defense, 'including whether to plead guilty, how to allocate investigatory resources, and what strategy to deploy at trial.' "  (*Vaquera*, at p. 727.)

That is not the case here.  In this case, the accusatory pleading *did* provide defendant timely actual notice the prosecution was seeking a sentence of 25 years to life under the One Strike law.  The information was amended before trial and the One Strike allegation attached to each count specifically cited section 667.61, subdivision (a), which provides for a 25-year-to-life sentence.  In other words, unlike *Vaquera,* defendant could *not* infer the prosecution had exercised its discretion to reject a possible 25-year-to-life sentence under subdivision (a) and seek only a sentence of 15 years to life under subdivision (b).  (*Vaquera*, at p. 727.)

Further, the One Strike allegations expressly alleged defendant had been convicted "in these proceedings of committing an offense specified in subdivision (c) of Penal Code § 667.61 against more than one victim."  The only crime charged in this case was section 288, subdivision (a), which necessarily requires proof the victim was under age 14 as required under section 667.61(j)(2). (See *Vaquera, supra,* 15 Cal.5th at p. 725, fn. 12 [noting three offenses to which One Strike law applies require proof the victim was under age 14, and for *other* offenses, due process requires the One Strike allegation to specify the victim was under age 14 when prosecution is seeking

a longer sentence under § 667.61, subd. (j)(2) on that basis].)  There is no dispute that the statutory pleading requirement was met by the allegation that the offense was committed against more than one victim.  (§ 667.61, subds. (e)(4) & (*o*).)  Thus, defendant had timely actual notice that the prosecution was seeking a 25-year-to-life sentence under the One Strike law, and all of the facts supporting imposition of that sentence were alleged in the information and found true by the jury beyond a reasonable doubt.

In his supplemental brief, defendant argues "[t]he One Strike allegations are essentially the same as those the Supreme Court found wanting" in *Vaquera*, but he does not address the critical distinction that the amended information here alleged section 667.61, subdivision (a) providing for a 25-year-to-life sentence.  Nor is there any reason to conclude defendant was prejudiced in preparing his defense strategy, particularly given that he had actual notice the prosecution was seeking a 25-year-to-life sentence and the information alleged all facts required to impose that sentence under section 667.61(j)(2).  (See, e.g., *People v. Anderson*, *supra*, 9 Cal.5th at p. 964 [purpose of pleading requirement is "to give sufficient notice to permit the defense to make informed decisions about the case, including whether to plead guilty, how to allocate investigatory resources, and what strategy to deploy at trial"].)  Nothing in the parties' briefing or the record indicates defendant was offered and refused a plea bargain that might have been influenced by ambiguity regarding his potential sentence under the One Strike law.  Further, there is nothing to suggest defendant might have allocated investigatory resources differently or presented a different defense had the information specified the One Strike allegation was also based on the victim's age.  The age of the victims was necessarily at issue in the underlying offenses, and defendant's defense theory was that the victims

34

were not telling the truth and he did not commit the acts at all. Under these circumstances, any possible error in failing to specifically plead either section 667.61(j)(2) or the victims' age was harmless.

"A defendant has a due process right to fair notice of any sentencing allegation that, if proven, will increase the punishment for a crime. [Citations.] In the sentencing enhancement context, the touchstone of fair notice is whether the accusatory pleading enables the defense to predict the sentence the defendant faces if convicted. To enable a defendant to make this prediction, an accusatory pleading must provide the defendant with fair notice of the factual basis on which the prosecution is seeking an increased punishment and of 'the potential sentence.' " (*Vaquera*, *supra*, 15 Cal.5th at p. 717.) Here, defendant had fair notice that the prosecution was seeking a 25-year-to-life sentence and why. There is no reason to remand for resentencing under the One Strike law.

### 3. Discretion To Choose Sentencing Scheme

Defendant next argues that the case must be remanded to allow the trial court to exercise its discretion to choose whether to sentence defendant under the habitual sex offender or the One Strike sentencing scheme. As noted above, the trial court did not state it was staying defendant's One Strike sentence in the oral pronouncement of judgment, but the court's minutes reflect the sentence was stayed. We presume that notation was correct because it is not *inconsistent* with the oral pronouncement of judgment. (See *In re Julian R.* (2009) 47 Cal.4th 487, 498–499 [a judgment or order of the lower court is presumed correct, and all intendments and presumptions are indulged to support it on matters as to which the record is silent].) Further, a stay of the One Strike term is consistent with the procedure suggested in *People v. McQueen* (2008) 160 Cal.App.4th 27, 38, in

which a trial court should select the appropriate term under either section 667.61 or 667.71, then stay the alternative sentence.[11]  In any event, because we have rejected defendant's claim that he is entitled to a lesser sentence under the One Strike law, remand on this issue is unnecessary.

### D.  Cruel and Unusual Punishment

Defendant next contends his prison sentence of 110 years to life constitutes cruel and/or unusual punishment under both the state and federal Constitutions.

As an initial matter, we note defendant forfeited the claim by failing to raise it in the trial court.  Because defendant contends his trial attorney rendered ineffective assistance of counsel by failing to object, however, we also address his claims on the merits.  (See *People v. Speight* (2014) 227 Cal.App.4th 1229, 1248–1249.)

The Eighth Amendment prohibits imposition of a sentence " 'that is grossly disproportionate to the severity of the crime,' " but in a noncapital context, successful challenges are " 'exceedingly rare.' "  (*Ewing v. California* (2003) 538 U.S. 11, 21, 28–31 [in light of antirecidivist purpose of California's Three Strikes law, 25-year-to-life sentence for stealing three golf clubs worth

---

[11] There is a split of authority over how to impose sentence when a defendant is eligible for sentencing under both the habitual sexual offender and One Strike schemes.  (Compare *People v. Snow* (2003) 105 Cal.App.4th 271, 283–284 and *People v. Johnson* (2002) 96 Cal.App.4th 188, 205–206 [court should select sentence under appropriate sentencing scheme and strike or dismiss sentence under other scheme] with *People v. Lopez* (2004) 119 Cal.App.4th 355, 364 and *People v. McQueen*, *supra*, 160 Cal.App.4th at pp. 37–38 [court should impose sentence under either statute and stay sentence under the other]; see also Couzens & Bigelow, Sex Crimes: Cal. Law & Procedure (The Rutter Group 2023 update) ¶ 13:17.)  Defendant does not discuss the split in authority but contends the trial court should have stayed the alternative sentence under *McQueen*.

a total of $1,200 was not cruel and unusual].)  A sentence may violate the California Constitution's prohibition on cruel *or* unusual punishment "if . . . it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity."  (*In re Lynch* (1972) 8 Cal.3d 410, 424 (*Lynch*).)  Because the definition of the crime and the determination of punishment are uniquely in the domain of the Legislature, defendant must overcome a considerable burden to establish that his sentence is cruel or unusual.  (*People v. Johnson* (2010) 183 Cal.App.4th 253, 296.)

"[W]hen a defendant under an indeterminate sentence challenges that sentence as cruel or unusual punishment in violation of the California Constitution, the test is whether the maximum term of imprisonment permitted by the statute punishing his offense exceeds the constitutional limit, regardless of whether a lesser term may be fixed . . . ."  (*Lynch, supra,* 8 Cal.3d at p. 419.)  In assessing whether the maximum life sentence is " 'out of all proportion to the offense,' " we employ three "techniques" identified by the *Lynch* court.  (*Id.* at pp. 424–425.)  First, we "examine[ ] the nature of the offense and/or the offender, with particular regard to the degree of danger both present to society."  (*Id.* at p. 425.)  Next, we compare the sentence with the "punishments prescribed in the *same jurisdiction* for *different offenses* which . . . must be deemed more serious."  (*Id.* at p. 426.)  Finally, we compare the sentence with "the punishments prescribed for the *same offense* in *other jurisdictions* having an identical or similar constitutional provision."  (*Id.* at p. 427.)

In arguing his sentence constitutes cruel and unusual punishment, defendant focuses primarily on the nature of his offenses and his personal background.  He argues his offenses were brief, did not involve force or

intimidation, and defendant did not engage in similar behavior after the molestations on the camping trip. He notes he is a military veteran, community volunteer, and did well in prison and on parole.

We disagree the nature of his offenses and his background compel a conclusion that defendant's sentence was cruel or unusual. Defendant committed multiple sex crimes against young children over the course of many years, against three different boys who had been entrusted to his care. (See, e.g., *People v. Baker* (2018) 20 Cal.App.5th 711, 719, 725 [15-year-to-life sentence for convicted child molester with no prior history of sex crimes and otherwise insignificant criminal record was not cruel and/or unusual]; *People v. Christensen* (2014) 229 Cal.App.4th 781, 803–804 [five separate acts of lewd conduct on three different victims were supportive of very long prison term].) Further, defendant was a mature and recidivist offender, who was not deterred by the prior prison term he served for the molestation of R.R. As defendant acknowledges, it is also " 'of course, significant' " that he committed his crimes in this case against two victims. Moreover, defendant caused the boys substantial emotional and psychological harm. The trial court remarked on the particularly traumatic experience of testifying for both R.R. and John Doe 1, and the trial court's receipt of letters from the parents of both John Does 1 and 2, attesting to the psychological damage done by defendant. John Doe 1's mother wrote that defendant had caused "unbelievable damage" and "trauma" to John Doe 1 and the entire family. John Doe 2's mother wrote that he had been so traumatized by his experience with defendant that he needed to attend school through a "Home Hospital" and would likely need counseling for the rest of his life.

Defendant relies on *In re Rodriguez* (1975) 14 Cal.3d 639 to argue his sentence was disproportionate, but that case is inapposite because it did not

involve a repeat offender.[12]  Moreover, nothing in the record indicates defendant had a mental disability, a low IQ, or a learning disorder as did the defendant in *Rodriguez*.  (*Rodriguez*, at pp. 655–666 [punishment was excessive where defendant's "conduct was explained in part by his limited intelligence" and his "inability to cope" with his "intellectual and sexual inadequacy"].)

Under the second prong of the *Lynch* test we compare defendant's sentence to punishments for more serious crimes in California.  (*Lynch*, *supra*, 8 Cal.3d at p. 426.)  Defendant argues substantially shorter sentences are often imposed for crimes that are arguably more serious than lewd conduct with a child under 14.  But " '[p]unishment is not cruel or unusual merely because the Legislature may have chosen to permit a lesser punishment for another crime.  Leniency as to one charge does not transform a reasonable punishment into one that is cruel or unusual.' "  (*People v. Baker*, *supra*, 20 Cal.App.5th at p. 727.)  In particular, " 'great deference is ordinarily paid to legislation designed to protect children, who all too frequently are helpless victims of sexual offenses.' "  (*Id.* at p. 729.)  Lengthy sentences for sexual offenses against children have been upheld by numerous courts.  (See, e.g., *People v. Reyes* (2016) 246 Cal.App.4th 62, 82–90 [life without possibility of parole not cruel and unusual punishment for committing two forcible sex offenses against a minor]; *People v. Perez* (2013) 214 Cal.App.4th 49, 51, 60 [30 years to life for committing two forcible lewd acts against a child under the age of 14]; *People v. Retanan* (2007) 154 Cal.App.4th 1219, 1230–1231 [135 years to life for multiple sex offenses

_____

[12] We do not address defendant's reliance on an opinion that has since been ordered depublished by the California Supreme Court.  (*People v. Cadena* (Dec. 11, 2019, B281175) opn. ordered nonpub. Dec. 11, 2019, S258791.)

involving minors].) We conclude defendant has not shown his sentence is one of those " 'rarest of cases' " in which the " 'length of a sentence mandated by the Legislature is unconstitutionally excessive.' "[13] (*Baker*, at p. 724.)

As to defendant's federal constitutional claim, the Eighth Amendment " 'does not require strict proportionality between crime and sentence,' but rather 'forbids only extreme sentences that are "grossly disproportionate" to the crime.' " (*Graham v. Florida* (2010) 560 U.S. 48, 59–60.) To decide whether a sentence is grossly disproportionate to the crime, a court "begin[s] by comparing the gravity of the offense and the severity of the sentence. [Citation.] '[I]n the rare case in which [this] threshold comparison . . . leads to an inference of gross disproportionality,' " the court compares defendant's sentence with sentences received by offenders in the same jurisdiction and with sentences imposed for the same crime in other jurisdictions. (*Id.* at p. 60.) For the reasons set forth above in our analysis under the first *Lynch* prong, the gravity of the offense and the severity of the sentence do not give rise to a preliminary determination that sentencing defendant to 110 years to life would be excessive. On this basis alone, we conclude such a sentence would not be "grossly disproportionate" under the Eighth Amendment to the federal Constitution.

Considering the totality of the circumstances, we conclude defendant's 110-year-to-life sentence does not offend either the state or federal prohibition against cruel or unusual punishment.

---

[13] Defendant does not address the third Lynch prong and, accordingly, we find it unnecessary to compare his punishment with the same offense in other jurisdictions. (See *People v. Norman* (2003) 109 Cal.App.4th 221, 230 [disproportionality need not be shown using each of the *Lynch* techniques].)

### E. Remand for Resentencing

As noted above, the trial court sentenced defendant to five years on each count for his prior serious felony and imposed but stayed a one-year enhancement for his prior prison term. Defendant asked us to remand to allow the trial court to consider whether to exercise its newfound discretion, pursuant to Senate Bill No. 1393 (2017–2018 Reg. Sess.) (Senate Bill 1393), to strike the previously mandatory prior serious felony enhancements under section 667, subdivision (a). Defendant also asks us to remand under Senate Bill No. 136 (2019–2020 Reg. Sess.), which amended section 667.5, subdivision (b) to provide that a one-year prior prison term enhancement will only apply if defendant served a prior prison term for a sexually violent offense as defined in Welfare and Institutions Code section 6600, subdivision (b). (See Stats. 2019, ch. 590, § 1.) Because the statutory amendments mitigate and reduce punishment respectively, defendant is entitled to their benefit. (*In re Estrada* (1965) 63 Cal.2d 740, 742, 744–745.)

The Attorney General argues we need not remand for resentencing because the record shows the trial court would not have exercised its discretion to strike the prior serious felony enhancements. Essentially, the Attorney General argues that we can assume from the trial court's comments at sentencing and its decision to run counts one and three consecutively rather than concurrently that it would not have exercised its discretion to reduce defendant's sentence by striking the prior serious felony conviction enhancements.

We disagree that it is clear from the record that the trial court would not have stricken the enhancements pursuant to Senate Bill No. 1393. While the trial court spoke at the sentencing hearing about the pain defendant inflicted on his victims and defendant's failure to reform after his first prison

sentence, it also commented defendant is not "a mean man" and "has a disconnect that we can't address." The trial court emphasized that under the legislative scheme, it was required to impose "the incredible number that I have to give to [defendant] as a result of this offense." Accordingly, we remand to allow the trial court to exercise its discretion whether to strike enhancements for the prior serious felony conviction. We express no opinion on how the trial court should exercise its sentencing discretion.

As to the one-year prison prior enhancements, defendant requests that we remand to permit the court to strike the sentences for his prior prison terms. We note neither party discussed whether defendant's prior conviction for violation of section 288, subdivision (a) qualifies as a "sexually violent offense" within the meaning of Welfare and Institutions Code section 6600. (See § 667.5, subd. (b) [one-year enhancement for prior prison term applies only if defendant served a prior prison term for a sexually violent offense as defined in Welf. & Inst. Code, §§ 6600, 6600.1].) Because we must remand for the trial court to exercise its discretion with regard to the five-year enhancements for the prior felony conviction, we direct the trial court to also determine on remand whether the stayed one-year prison prior enhancements should be stricken. We express no opinion on this issue.

### III. DISPOSITION

We remand for the trial court to exercise its discretion under section 1385 whether to strike defendant's enhancements for his prior serious felony conviction, and to determine whether the one-year enhancements imposed and stayed pursuant to section 667.5, subdivision (b) should be stricken. The judgment is otherwise affirmed.

We observe that the abstract of judgment reflects defendant's sentence on counts one, two, and three were 25 years to life rather than 50 years to

life.  On remand, the trial court shall ensure the abstract of judgment correctly reflects defendant's sentence.  The trial court is directed to prepare an amended abstract of judgment and forward a certified copy to the Department of Corrections and Rehabilitation.

SIGGINS, J.*

WE CONCUR:

HUMES, P. J.

LANGHORNE WILSON, J.

A151488
*People v. Camphor*

---

* Retired Presiding Justice of the Court of Appeal, First Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.